UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
RICHARD WHITE,

                Petitioner,     05 Civ. 465 (RJS)(DFE)

     - against -       REPORT AND RECOMMENDATION
                                   TO JUDGE SULLIVAN
DALE ARTUS,

                Respondent.
-------------------------------x

DOUGLAS F. EATON, United States Magistrate Judge.

    Richard White brings this *pro se* habeas petition to
challenge his conviction after a 1998 jury trial before Justice
Martin Marcus in Supreme Court, Bronx County.  White's trial
attorney was Christopher Spellman of The Legal Aid Society.  The
jury found White not guilty of attempted murder but guilty of
first-degree assault, first-degree burglary, and second-degree
criminal possession of a weapon.  On July 30, 1998, he was
sentenced, as a second felony offender, to three concurrent terms
of 15 years in prison.

    The conviction was affirmed, *People v. White*, 294 A.D.2d
295, 742 N.Y.S.2d 545 (1st Dept. 2002), *leave denied*, 98 N.Y.2d
714, 749 N.Y.S.2d 12 (Aug. 5, 2002).  The conviction became final
on November 3, 2002.  After that, much time was tolled by White's
first motion to vacate the judgment and then by his first
application for coram nobis.  Shortly before the one-year statute
of limitations expired, White mailed his original habeas petition
(dated November 21, 2004, postmarked November 30, 2004, and
received by our Court's Pro Se Office December 3, 2004).  In an
order dated January 14, 2005, Chief Judge Mukasey (a) noted that
the original petition appeared to raise only one ground,
ineffective assistance of trial counsel, and (b) granted White 60
days to "amend his petition to detail all grounds he seeks to
raise."  White submitted a first amended petition dated February
28, 2005, adding the five issues that had been presented to the
Appellate Division by his appellate attorney.

    Almost three years later, after pursuing a second motion to
vacate the judgment and a second application for coram nobis,
White submitted his second amended habeas petition dated December
14, 2007.  On May 9, 2008, Assistant District Attorney Nancy D.
Killian filed the trial transcript.  On the same date, she served

and filed an opposing affidavit, which annexed a 43-page memorandum of law plus Exhibits 1 through 27.  (I shall refer to certain of those exhibits as "Exh. __.")  I note that Exh. 10 is an 8-page decision by Justice Marcus dated December 22, 2003 denying the first motion to vacate.  I note that Exh. 21 is a 14-page decision by Justice Marcus dated May 11, 2006 denying the second motion to vacate.

On August 11, 2008, White filed a reply memorandum (48 pages plus Exhibits A, B, and C), dated July 28, 2008 and postmarked August 8, 2008.

On January 7, 2009, Judge Sullivan referred the case to me for a report and recommendation.  For the reasons set forth in today's report, I recommend that Judge Sullivan deny White's second amended habeas petition.

## **The trial evidence**

The trial evidence is described in detail in the briefs by White's appellate attorney Paul J. Angioletti (Exh. 1 at pp. 3-15) and by the prosecution (Exh. 2 at pp. 4-11).  The jury heard testimony from Police Officer Franzoso, Detective Carley, and a medical expert; most importantly, the jury heard testimony from the victim Leonard Jeffries (Tr. 424-75), from his wife Alicea Hamilton Jeffries (Tr. 475-79), and from her son Herbie Hamilton (Tr. 483-562).

On November 3, 1996, Mr. and Mrs. Jeffries had an argument; she spit at him, he pushed her to the floor, and she called the police.  In the early morning of November 4, she left her husband's apartment for some 24 hours and stayed at the apartment of her son Herbie Hamilton.  (Tr. 476-79.)  He testified that she told him about the argument, and that he promptly discussed this with his uncle, the defendant Richard "Moe" White.  On November 4, 1996, Hamilton was 19 and White was 28.  (Tr. 486, 595.) Hamilton said that Leonard ("Cusar") Jeffries had "hit my mother ... and I wanted to go over there and smack him up."  (Tr. 488.) White said "I'll walk with you over there to talk to him."  (Tr. 489.)  When they arrived at the apartment, Jeffries opened the door for Hamilton.  White went in right behind Hamilton and shoved Jeffries.  Hamilton asked Jeffries "why he hit my mother" and "are you ready to die?"  White had a gun in his hand.  He used it to hit Jeffries in the head, and he then shot Jeffries once in the upper thigh and once in the arm.  White and Hamilton then fled.  (Tr. 490-99.)

Before Hamilton testified, Jeffries had already given the

-2-

jury the same description of the shooting.  (Tr. 428-37.)
Jeffries testified that White was wearing a scarf over his mouth,
but that he recognized White because White was a half-brother of
Jeffries's wife and had stayed at the Jeffries apartment on an
earlier occasion.  (Tr. 438-39.)  A neighbor's 911 call brought
the police.  Jeffries gave the responding officer a description
of two suspects; he gave the name of Herbie Hamilton, but said he
could not identify the second person because of the scarf.  On
November 22, ten days after he came home from the hospital,
Jeffries told Detective Carley that the second man had been the
shooter and that his name was Richard "Moe" White.  (Tr. 587-88.)
Jeffries testified that he had withheld this information for 18
days because of fear of White.  (Tr. 447, 460.)

     Detective Carley arrested White on December 6, 1996, and
arrested Herbie Hamilton on January 12, 1997.  Upon being
arrested for attempted murder, Hamilton stated that he and White
had gone to Jeffries's apartment and that White had shot
Jeffries, although Hamilton's statement claimed that he had been
out in the hallway when the shots were fired.  (Tr. 500-03, 525,
532, 537.)  Hamilton was on probation following his guilty plea
to possessing a different gun back in 1995.  In the fall of 1997,
after he had been held in jail for nine months, he entered into
an agreement with the District Attorney's Office.  He agreed to
testify truthfully against White; in exchange, he was released on
bail and reinstated to probation for his 1995 conviction.  On
December 17, 1997, he pleaded guilty to a new charge of gun
possession, on the ground that he had been acting in concert with
White on November 4, 1996.  (Tr. 485-86, 502-03, 521, 529-31.)

     The defense called only one witness, the defendant's sister
Annette White, who testified that the defendant had been at her
apartment at a party on November 4, 1996, from 3:00 p.m. until
after midnight.  (Tr. 605-14.)  The shooting in Jeffries's
apartment had occurred shortly before 7:30 p.m.  (Tr. 380, 429.)

     The jury found White not guilty of attempted murder but
guilty of first-degree assault, first-degree burglary, and
second-degree criminal possession of a weapon.  On July 30, 1998,
he was sentenced, as a second felony offender, to three
concurrent terms of 15 years in prison.

### **The direct appeal**

     Paul Angioletti, Esq. represented White on appeal.  On
February 19, 2001, he submitted a well-written, 44-page brief for
White.  (Exh. 1.)  It presented five points to the Appellate
Division:

Point I.  The conviction was against the weight of the evidence.  (Exh. 1, pp. 16-23.)

Point II.  The judge should not have allowed Detective Carley to testify that Hamilton had made a prior consistent statement that White had been the shooter.  (Exh. 1, pp. 24-31.)

Point III.  The judge's instruction on accomplice testimony was inadequate, even though not objected to.  (Exh. 1, pp. 31-37.)

Point IV.  The judge's instruction that White's sister was an interested witness was improper, even though not objected to. (Exh. 1, pp. 37-42.)

Point V.  The 15-year sentence was excessive.  (Exh. 1, pp. 42-44.)

Points I and V did not and do not raise any federal claim. They were addressed to the special discretionary jurisdiction of the Appellate Division.  Its unanimous decision said:  "The verdict was not against the weight of the evidence.  The issues raised by the defendant ... were properly placed before the jury and we find no reason to disturb its credibility determinations. ....  Defendant's claim that his sentence is excessive is unpersuasive and we perceive no basis to reduce it."  (Exh. 3.)

On Points III and IV, the Appellate Division wrote: "Defendant's contentions concerning the court's charge are ... unpreserved and we decline to review them in the interest of justice."  (Exh. 3.)  This ruling was entirely reasonable.  At Exh. 1, p. 36, n.7, Mr. Angioletti argued that trial counsel should have requested an instruction "as to whether any benefit he [Hamilton] received affected [his] truthfulness."  However, at trial counsel's request (Tr. 618) the judge had pointedly commented on Hamilton's plea agreement; see Tr. 672-73, where the reporter's punctuation is muddy but it seems quite clear that the judge told the jury:

> You also [may] wish to consider whether a witness has or does not have an interest in the outcome of the case, which [a]ffects the believability of his or her testimony.  A witness is an interested witness when[,] by reason of relationship, friendship, antagonism or prejudice in favor of or against one party or the other[,] [t]he witness's testimony[,] in your judgment[,] is in fact biased or likely biased toward the side or party the witness favors[.]

-4-

> [B]ased on the testimony[,] **you heard about a plea agreement between the people and Herbie Hamilton. Mr. Hamilton is an interested witness** in this case. Based on the testimony[,] you heard that Annette White is the defendant's sister[;] she is an interested witness in this case.
>
> If you find that a witness is an interested witness or if you find that a witness is not an interested witness, it is for you to decide whether and to what extent, if any, that interest or lack of interest affects the believability of the witness.

(Tr. 672-73, with my emphasis.)  White's *pro se* reply memorandum, at page 38, now argues that the transcript should be corrected to reflect that the judge said that Mr. Hamilton is a "creditable" witness and that the defendant's sister is a "creditable" witness.  I reject this argument. See earlier, at Tr. 618:

> MR. SPELLMAN:  I would like the direct charge that he [Herbie Hamilton] is an interested witness.
> THE COURT:  Based on the cooperation agreement?
> MR. SPELLMAN:  Yes.

Later, during Mr. Spellman's summation, there was an "off the record discussion at the bench" at Tr. 634, which the judge put on the record as soon as the jury left the courtroom at Tr. 652: "I just wanted to get on the record that when I interrupted Mr. Spellman ... I just wanted to let him know and Miss Roth that after reviewing the interested witness charge that I was [and am] going to charge that Mr. Hamilton was an interested witness[;] and the People, Miss Roth, requested that I charge also the defendant's sister was an interested witness.  I will do that as well.  Okay."

The one other point on appeal was Point II, which invoked the New York caselaw against "bolstering."  Herbie Hamilton testified as follows.  On November 4, 1996, he and his uncle Richard "Moe" White entered the apartment of Leonard Jeffries and White shot Jeffries twice.  (Tr. 492-98.)  On January 12, 1997, Hamilton was arrested and questioned by Detective Carley:

> Q.  What did you tell Detective Carley happened in that apartment?
> A.  I told him my uncle shot him.

(Tr. 501.)  Mr. Spellman cross-examined Hamilton at Tr. 506-57 and 559-62.  Detective Carley began testifying at Tr. 585.  At Tr. 589, as soon as the prosecutor started to mention the arrest

of Hamilton, Mr. Spellman obtained permission to approach the bench.  A robing room conference ensued at Tr. 589-92 (with my emphasis added):

      MR. SPELLMAN:  Judge, my objection is to the hearsay.  ....  **It is clear from Herbie's testimony** and it is unchallenged essentially **that he gave this detective a statement early on saying** who - - **that Richard was involved,** [and] he gave the DA's office a statement in October of '97 indicating that Richard was involved, and he pled [in December 1997] and said the same thing.  Those were not challenged, that those statements were made, so why this detective should be permitted to testify to hearsay as to what Herbie Hamilton told him at some point is particularly irrelevant.

      MS. ROTH:  May I respond?

      THE COURT:  Yes.

      MS. ROTH:  ... [O]n cross examination of Mr. Hamilton earlier today Mr. Spellman opened the door of a recent fabrication[,] that Mr. Hamilton would say anything to go forward with a plea bargain made with this District Attorney's office[;] and the detective[']s statement is being offered to show the jury that as far back as January, 1997, well in advance of the October 1997 plea bargain worked out with this office, he had all along told the authorities who was involved and the extent of the involvement, so there is no recent fabrication[,] and it should not only be Herbie Hamilton's word, which has been impeached by cross examination permitted at the trial.

      THE COURT:  It is not quite ["]all along["] but it does pre-date the plea bargain and as such, it's a prior consistent statement that is being offered here[,] made at a time prior to motive for fabrication, so it is not being offered again for the truth but again being offered for the fact it was said and it was said at a time before the motive to fabricate existed, the one that you [Mr. Spellman] have offered[;] and I understand you are not challenging it[,] but in a situation where you have attacked the credibility of the witness in the way that you have, the People are allowed to prove that prior consistent statement by someone in addition to the declarant, so the objection is overruled.

At Tr. 592-94, Detective Carley then testified as follows:

     Q.  ... I believe I asked you whether or not
Herbie Hamilton made a statement to you when you
arrested him.
     A.  Yes, he did.
        *   *   *
     Q.  Who did he tell you was involved?
     A.  Richard White and Herbie Hamilton.
     Q.  What did he tell you Richard White's role
was in that incident?
     MR. SPELLMAN:  Objection.
     THE COURT:  Overruled.
        *   *   *
     A.  He told me that Richard White had shot
Leonard Jeffries.

On appeal, Mr. Angioletti invoked the New York caselaw
against "bolstering." (Exh. 1, pp. 24-31.)  The Appellate
Division ruled:

     Defendant claims that the court erred in
permitting the prosecution to elicit, on rebuttal, the
accomplice's prior consistent statement, in an attempt
to rehabilitate or bolster his testimony implicating
defendant, which had been attacked on cross-examination
as a recent fabrication.  The alleged motive for such
recent fabrication was that it was intended to help the
accomplice obtain a favorable plea bargain and to
favorably resolve a possible violation of probation on
an earlier conviction.  Defendant contends that the
same motive existed when the accomplice made the prior
statement shortly after his arrest as existed at trial.
However, defendant's objection at trial was made solely
on the ground of relevance and his present objections,
including those relying on the State and Federal
constitutions, have not been preserved for our review
and we decline to review them in the interest of
justice.  Were we to do so, we would reject them.  One
of the possible reasons for the witness to fabricate,
*viz.,* a possible violation of probation on an earlier
conviction, did not arise until after the earlier post-
arrest statement.  "In order to be admissible, the
statement was not required to predate all possible
motives to falsify (*People v. Baker*, 23 N.Y.2d 307,
322-323 [296 N.Y.S.2d 745, 244 N.E.2d 232])" (*People
v. Kanani,* 272 A.D.2d 186, 187, 709 N.Y.S.2d 505, *lv.
denied* 95 N.Y.2d 935, 721 N.Y.S.2d 612, 744 N.E.2d
148).

"Bolstering claims have been (expressly) held not to be cognizable on federal habeas review." *Diaz v. Greiner*, 110 F.Supp.2d 225, 234 (S.D.N.Y. 2000) (Berman, J., citing cases). *Accord:  Nieves v. Fischer*, 2004 WL 2997860, *6-7 (S.D.N.Y. Dec. 28, 2004) (Chin, J.); *Warren v. Conway*, 2008 WL 4960454, *19-22 (E.D.N.Y. Nov. 18, 2008) (Feuerstein, J.).  In the case at bar, White's attorney had already cross examined the declarant (Herbie Hamilton) concerning Hamilton's post-arrest statement. Therefore, in my view, White cannot show that he was deprived of his right to confront and cross-examine the declarant even if he could invoke *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004).  Any attempt by White to invoke *Crawford* is prohibited by *Whorton v. Bockting*, 549 U.S. 406, 127 S.Ct. 1173 (2007), because White's conviction became final in 2002, long before the *Crawford* decision was issued.

In sum, Mr. Angioletti presented five well-written points of state law on the direct appeal, but none of them has any traction in a federal habeas proceeding, which is limited to issues of federal law.

_____Starting in 2003, White has made *pro se* attempts to raise issues that were not raised in the direct appeal.

### The first motion to vacate the judgment

In September 2003, White made his first motion to vacate the judgment of conviction.  That motion (Exh. 8) made two arguments. First.  The motion stated (at p. 1):  "Before the arraignment began the defendant was handed an **unsigned** copy of his indictment ....  **At no point** before the defendant entered a plea of not guilty **were all the charges read** or did the defendant waive all charges being read ...."  (Emphasis added.)  The motion argued (at pp. 2-8) that these defects meant that the state court lacked jurisdiction over him and deprived him of due process.  Second. The motion (at pp. 9-17) complained about the events at Tr. 597-601.  At Tr. 596, the judge told the jury he expected that jury deliberations would begin the next day.  At Tr. 598, Juror No. 11 reentered the courtroom in the presence of White, the attorneys, the reporter, and the judge.  The juror stated that he was in methadone treatment and normally received a three-day supply; he requested the judge to give him a note so he could get a four-day supply that evening.  (The clinic was open 7:00 a.m. to 7:00 p.m.)  Mr. Spellman said "That is fine."  (Tr. 601.) White made no objection, even though there were alternate jurors (see Tr. 705).  Five years later, White noted (Exh. 8, pp. 15-16) that the juror used the word "obtained" to mean "detained" at Tr.

598 and 599, but this certainly does not show that the juror was
unqualified.  At page 15, White makes a general assertion that
Tr. 598-601 makes clear that the juror "is having a problem
comprehending what the court is asking and the court is having a
problem understanding his responses."  Having read those pages, I
emphatically disagree.

Judge Marcus denied the September 2003 motion to vacate, and
stated his reasons in an 8-page decision dated December 22, 2003
(Exh. 10).  I find the decision to be entirely reasonable.  Leave
to appeal was denied on April 6, 2004.  (Exh. 11.)

### The first application for coram nobis

On April 17, 2004, White made his first application for
coram nobis.  (Exh. 12.)  He told the Appellate Division that he
had been denied effective assistance of appellate counsel because
Mr. Angioletti's 2001 appeal had failed to make the arguments
contained in White's 2003 motion to vacate, and had failed to
argue that trial counsel was ineffective for not calling a
witness mentioned in the victim's medical records (Mandi
Goldstein) and for not making a speedy trial motion.

On July 15, 2004, the Appellate Division denied coram nobis.
(Exh. 14.)  Leave to appeal to the Court of Appeals was denied on
October 22, 2004.  (Exh. 15.)

### The habeas petition and the amended habeas petition

As mentioned at page one of today's Report, White sent our
Court a habeas petition dated November 21, 2004 and an amended
habeas petition dated February 28, 2005.

On July 31, 2005, White made a motion (Exh. 17) asking that
his petition be held in abeyance while he made a second motion to
vacate in the trial court.  By order dated February 2, 2006 (Exh.
18) Judge Karas held the petition in abeyance.

### The second motion to vacate the judgment

Meanwhile, on August 22, 2005, White made the second motion
to vacate, arguing that Mr. Spellman had provided ineffective
assistance at trial.  (Exh. 19.)  The District Attorney's office
submitted an opposing affirmation and memorandum of law (both at
Exh. 20).  Justice Marcus denied the motion by issuing a 14-page
decision on May 11, 2006.  (Exh. 21.)  Leave to appeal was denied
on August 2, 2006.  (Exh. 22.)

## The second application for coram nobis

On August 23, 2006, White made a second application to the Appellate Division for coram nobis.  (Exh. 23.)  For the first time, White raised an argument based on Tr. 616-17.  There, Mr. Spellman asked the judge to give the jury a chance to convict on the lesser included offense of second-degree assault, on the theory that "the jury could find that the result of the bullet wounds was [merely] physical injury as opposed to serious physical injury."  (Tr. 616.)  The judge explicitly denied Mr. Spellman's application, but the reporter made an obvious mistranscription of one small word, which I shall now emphasize in bold font.  The original transcript quoted the judge as ruling:  "[B]ased on the evidence in the case, both the testimony of the doctor and the testimony of Mr. Jeffries, there is **a** reasonable view of the evidence that there is [merely] physical injury but not serious physical injuries[,] so that application is denied."  (Tr. 617.)  Based on the evidence and the context of Mr. Spellman's application, both attorneys clearly understood that the judge had said that "there is **no** reasonable view" that the bullet wounds (which resulted in surgery and 8 days in the hospital) were non-serious.  Yet White's second application for coram nobis asserted that Tr. 617 was "tantamount to an acquittal" on the charge of first-degree assault (Exh. 23, p. ii) and therefore when the judge proceeded to submit that charge to the jury he was acting "without legal jurisdiction" and was violating "defendant's rights under the double jeopardy clause" (*Id.*, pp. ii-iii).

In January 2007, the District Attorney's office submitted an opposing affirmation and memorandum of law (both at Exh. 24), along with the court reporter's correction of that one word at Tr. 618 from "a" to "no" (Exh. 25).

_____On April 12, 2007, the Appellate Division denied coram nobis.  (Exh. 26.)  I find that ruling entirely reasonable. Leave to appeal to the Court of Appeals was denied on November 15, 2007.  (Exh. 27.)

## The second amended habeas petition

As noted at pages 1-2 of today's Report, the second amended habeas petition is dated December 14, 2007; ADA Killian's opposing affidavit and memorandum of law was filed on May 9, 2008; and White's reply memorandum was filed on August 11, 2008.

I have already rejected all of White's arguments except for his claim that Mr. Spellman provided ineffective assistance.

-10-

That claim was rejected by the trial judge's decision dated May
11, 2006.  (Exh. 21.)  I find that decision to be entirely
reasonable.

First, White complains that trial counsel should have moved
to dismiss the indictment because the People failed to provide
him with notice that some charges that were not part of the
felony complaint would be presented to the grand jury.  The trial
judge's decision (Exh. 21, pp. 6-7) cited four First Department
cases to show why such a dismissal motion would have been
baseless.  White's 2008 Reply Memorandum devotes pages 25-27 to
this claim, but he simply ignores those four cases.

Second, White complains that trial counsel should have moved
to dismiss the indictment based on New York's speedy trial
statute.  The trial judge's decision (Exh. 21, pp. 7-10)
explained why such a motion would have lacked merit.  White's
2008 Reply Memorandum devotes pages 28, 29 and 29-A to this
claim, but fails to show why the judge's decision was
unreasonable.

Finally, White complains that trial counsel "failed to
question the complain[an]t witness [Jeffries] regarding his
inconsistent stat[e]ment[s] regarding who shot him," and "failed
to subpoena" Mandi Goldstein, a social worker whose notes
appeared in Jeffries's hospital records.  (White's 7/28/08 Reply
Memo., p. 30.)  This complaint sounds serious, but upon
inspection it lacks merit.  This complaint appears in White's
Reply Memorandum at pages 5 and 30-32, discussing Reply Exhibits
B-1, B-2, B-3, and B-4.  (Note:  The Reply Memorandum at page 30
mistakenly refers to those exhibits as D-1, D-2, D-3, and D-4.)
At the end of today's Report, I am annexing copies of those four
exhibits but unlike White I am annexing them in chronological
order, as follows:

Reply Exh. B-1, Detective Howard Denton's 11/5/96
typewritten memo, says (with my emphasis):  "On Nov 4, 1996 at
approx 1950 hrs the undersigned with Det Scott responded to ...
on a report of a man shot.  ....  The undersigned did a
preliminary interview of the victim who stated that his name was
Leonard Jeffries ....  Tonight his stepson Herbie Hamilton M-B-19
came to the Apt with his friend M-Black 19 .... [T]he **Male black**
then struck him in the head with a gun and then fired 2 shots at
him ...."  As will be seen, trial counsel managed to avoid
opening the door to introduction of this record of Jeffries's
11/4/96 statement.  The statement clearly said that the shooter
was not Herbie Hamilton but rather "the Male black" who was
Herbie's "friend" (even though it erroneously said that this

friend was also 19).

Reply Exh. B-3, Jacobi Medical Center Social Worker
Mandi Goldstein's 11/6/96 psychosocial assessment, says in part
(with my emphasis):  "Mr. Jeffries is a 37 year old black male,
hospitalized for GSW's to arm and leg.  [H]e states that he was
arguing with his wife, they spit on each other, and later that
nig[ht] **his stepson shot him**.  He expressed that th[e] incident
was scary and upsetting, and that [he] will not be returning to
his wife."  As will be seen, the second of the three quoted
sentences came into evidence during the cross examination of a
Jacobi physician at Tr. 583.

Reply Exh. B-2, Detective Brusack's 11/10/96
typewritten memo, says (with my emphasis):  "Date 11/07/06 ....
On this date at approximately 0950 Hrs, ... complainant stated
the following:  "My wife, Alicea and me had a verbal argument on
Sunday, 11/03/96 that turned into a spitting match.  Everything
was forgotten about, when on Monday night, my wife[']s son,
Herbie Hamilton knocked on the door.  I opened the door, and
**another guy** pushed his way in behind Herbie.  .... [T]he **other
guy** took out a gun, and hit me in the head with it.  .... [T]he
**other guy** pointed the gun at me. ...."

Reply Exh. B-4, Detective Carley's typewritten memo,
says (with my emphasis):  "Friday 22 NOV 96 at approximately 2010
hrs, while present at the residence of [Leona]rd Jeffries[,] I at
this time interviewed the victim regarding the incident.  Mr.
[Jeffr]ies recounted the facts as given to Det. Brusack on
11/7/06.  ....  Once the [in]terview was completed the
undersigned left the apartment.  When leaving Mr. Jef[fries] left
also explaining to his wife that he was going out for cigarettes.
... [I]n lobby of building Mr. Jeffries informed me that ... in
the course of the struggle and fight the sc[ar]f was moved ....
**The second perp. was Moe, a brother of his wife Alecia,** known to
[him as?] **Richard White.**  At this time Leonard states that
initially he was hesitant about [naming?] [he]r brother, partly
from fear.  He states that he has no doubt that it was [W]hite.
He knows him for years."

Having obtained those four documents from the prosecutor,
Mr. Spellman conducted an effective cross-examination of Jeffries
at Tr. 449-73, and in particular at Tr. 464-65:

Q.  And you spoke to a lot of different people,
doctors, nurses?
A.  Yes, I did.
Q.  Social workers and everything else?

-12-

```
          A.   Yeah.
          Q.   ... November 6th ... after you were in the
     hospital for roughly two days or a day and a half
     or whatever, do you remember speaking to a social
     worker?
          A.   No, I can't really remember.  I could have,
     I can't really say.
          Q.   Okay.  Did you tell a social worker that
     you had been arguing with your wife and that you
     spit on each other, and later than night your stepson
     shot you?
          A.   No, I did not.
          Q.   Are you sure about that?
          A.   I'm positive.  I didn't say nothing like that.
     I said that we got into an argument, we spit on each
     other and that later on that night, my stepson came
     [- -] and shot me?  That is what I said?
          Q.   Is that what you said?
          A.   I didn't say anything like that.
          Q.   Like that[,] did you say?
          MS. ROTH:  Your Honor, I object.
          A.   First of all I didn't talk to no social worker.
```

(Tr. 465-65; I have italicized two words for clarity but not
because those two words are important.)  Also, I note that this
passage has been slightly mistranscribed by the District
Attorney's office, first in its February 2006 memorandum (Exh.
20, pp. 6-7) and again in its May 2008 memorandum (pp. 10-11), by
(a) typing a period (rather than a question mark) after the words
"shot me," and (b) omitting the next five words ("That is what I
said?").

          At Tr. 481, the trial was recessed for three days.  On
Monday, June 29, 1998, the prosecution presented three more
witnesses (Hamilton at Tr. 483-563, Jacobi's Dr. Harry Delaney at
Tr. 564-84, Det. Carley at Tr. 584-96) and rested its case at Tr.
596.

          The portion of the victim's testimony quoted above was
contradicted during Mr. Spellman's cross examination of Dr.
Delaney.  At Tr. 581-83, Dr. Delaney testified as follows.  "All
patients are seen by social workers."  The medical record in
front of him on the witness stand contains a report prepared by
social worker Mandi Goldstein, and he has met her.  It is
"frequently" part of the function of a social worker to obtain
information about the way the trauma occurred.  Her record
"states that Mr. Jeffries states that he was arguing with his
wife, that they spit on each other and later that night **his**

**stepson shot him.**" (Tr. 583, emphasis added.)

When the jury heard this, it was past 2:15 p.m. (when the luncheon recess had ended, Tr. 563-64). Therefore, the prosecution may well have lacked time to bring in Detective Denton to testify that, two days before the social worker's memo, Jeffries had stated that the shooter was not his stepson but rather his stepson's friend. (See Reply Exh. B-1, annexed to today's Report.) The next day, Mr. Spellman presented the defense case. If he had subpoenaed Mandi Goldstein, it seems unlikely that her testimony could have been more helpful to White than what the jury had already heard at Tr. 583. And there would have been a risk that she might have recalled that Jeffries was in pain and/or impatient, and that she might have pointed to her report that Jeffries's "judgment" was merely "fair." Moreover, if Mr. Spellman had subpoenaed Ms. Goldstein, then it seems likely that the prosecution would have had time to bring in Det. Denton as a rebuttal witness. Accordingly, I reject White's assertion that "it was necessary that Mandi Goldstein be called as a defense witness." (7/28/08 Reply Memo., p. 11A.)

The prosecutor's summation, at Tr. 650-51, was forced to deal with Tr. 583 and the victim's 11/6/96 statement to Ms. Goldstein. The guilty verdict shows that the jury was convinced by the testimony of Jeffries and Hamilton that the shooter was Richard White.

In sum, I reject White's assertion that trial counsel "failed to question the complain[an]t witness [Jeffries] regarding his inconsistent stat[e]ment[s] regarding who shot him." (7/28/08 Reply Memo., p. 30.)

In my view, both trial counsel and appellate counsel provided effective assistance to White, and White has not shown that he was deprived of any of his Constitutional rights.

## CONCLUSION AND RECOMMENDATION

_____For the reasons set forth above, I recommend that Judge Sullivan deny Richard White's second amended habeas petition.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 14 calendar days after being served with a copy **(i.e., no later than January 7, 2010),** by filing written objections with the Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Hon. Richard J. Sullivan, U.S.D.J. at Room 640, 500 Pearl Street, New York, NY



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
RICHARD WHITE,

                    Petitioner,        05 Civ. 465 (RJS)(DFE)

         - against -                   REPORT AND RECOMMENDATION
                                       TO JUDGE SULLIVAN

DALE ARTUS,

                    Respondent.
--------------------------------x

DOUGLAS F. EATON, United States Magistrate Judge.

     Richard White brings this *pro se* habeas petition to
challenge his conviction after a 1998 jury trial before Justice
Martin Marcus in Supreme Court, Bronx County.  White's trial
attorney was Christopher Spellman of The Legal Aid Society.  The
jury found White not guilty of attempted murder but guilty of
first-degree assault, first-degree burglary, and second-degree
criminal possession of a weapon.  On July 30, 1998, he was
sentenced, as a second felony offender, to three concurrent terms
of 15 years in prison.

     The conviction was affirmed, *People v. White*, 294 A.D.2d
295, 742 N.Y.S.2d 545 (1st Dept. 2002), *leave denied*, 98 N.Y.2d
714, 749 N.Y.S.2d 12 (Aug. 5, 2002).  The conviction became final
on November 3, 2002.  After that, much time was tolled by White's
first motion to vacate the judgment and then by his first
application for coram nobis.  Shortly before the one-year statute
of limitations expired, White mailed his original habeas petition
(dated November 21, 2004, postmarked November 30, 2004, and
received by our Court's Pro Se Office December 3, 2004).  In an
order dated January 14, 2005, Chief Judge Mukasey (a) noted that
the original petition appeared to raise only one ground,
ineffective assistance of trial counsel, and (b) granted White 60
days to "amend his petition to detail all grounds he seeks to
raise."  White submitted a first amended petition dated February
28, 2005, adding the five issues that had been presented to the
Appellate Division by his appellate attorney.

     Almost three years later, after pursuing a second motion to
vacate the judgment and a second application for coram nobis,
White submitted his second amended habeas petition dated December
14, 2007.  On May 9, 2008, Assistant District Attorney Nancy D.
Killian filed the trial transcript.  On the same date, she served

-1-

and filed an opposing affidavit, which annexed a 43-page
memorandum of law plus Exhibits 1 through 27. (I shall refer to
certain of those exhibits as "Exh. ___.") I note that Exh. 10 is
an 8-page decision by Justice Marcus dated December 22, 2003
denying the first motion to vacate. I note that Exh. 21 is a 14-
page decision by Justice Marcus dated May 11, 2006 denying the
second motion to vacate.

On August 11, 2008, White filed a reply memorandum (48 pages
plus Exhibits A, B, and C), dated July 28, 2008 and postmarked
August 8, 2008.

On January 7, 2009, Judge Sullivan referred the case to me
for a report and recommendation. For the reasons set forth in
today's report, I recommend that Judge Sullivan deny White's
second amended habeas petition.

## The trial evidence

The trial evidence is described in detail in the briefs by
White's appellate attorney Paul J. Angioletti (Exh. 1 at pp. 3-
15) and by the prosecution (Exh. 2 at pp. 4-11). The jury heard
testimony from Police Officer Franzoso, Detective Carley, and a
medical expert; most importantly, the jury heard testimony from
the victim Leonard Jeffries (Tr. 424-75), from his wife Alicea
Hamilton Jeffries (Tr. 475-79), and from her son Herbie Hamilton
(Tr. 483-562).

On November 3, 1996, Mr. and Mrs. Jeffries had an argument;
she spit at him, he pushed her to the floor, and she called the
police. In the early morning of November 4, she left her
husband's apartment for some 24 hours and stayed at the apartment
of her son Herbie Hamilton. (Tr. 476-79.) He testified that she
told him about the argument, and that he promptly discussed this
with his uncle, the defendant Richard "Moe" White. On November
4, 1996, Hamilton was 19 and White was 28. (Tr. 486, 595.)
Hamilton said that Leonard ("Cusar") Jeffries had "hit my mother
... and I wanted to go over there and smack him up." (Tr. 488.)
White said "I'll walk with you over there to talk to him." (Tr.
489.) When they arrived at the apartment, Jeffries opened the
door for Hamilton. White went in right behind Hamilton and
shoved Jeffries. Hamilton asked Jeffries "why he hit my mother"
and "are you ready to die?" White had a gun in his hand. He
used it to hit Jeffries in the head, and he then shot Jeffries
once in the upper thigh and once in the arm. White and Hamilton
then fled. (Tr. 490-99.)

Before Hamilton testified, Jeffries had already given the

-2-

jury the same description of the shooting. (Tr. 428-37.)
Jeffries testified that White was wearing a scarf over his mouth,
but that he recognized White because White was a half-brother of
Jeffries's wife and had stayed at the Jeffries apartment on an
earlier occasion. (Tr. 438-39.) A neighbor's 911 call brought
the police. Jeffries gave the responding officer a description
of two suspects; he gave the name of Herbie Hamilton, but said he
could not identify the second person because of the scarf. On
November 22, ten days after he came home from the hospital,
Jeffries told Detective Carley that the second man had been the
shooter and that his name was Richard "Moe" White. (Tr. 587-88.)
Jeffries testified that he had withheld this information for 18
days because of fear of White. (Tr. 447, 460.)

Detective Carley arrested White on December 6, 1996, and
arrested Herbie Hamilton on January 12, 1997. Upon being
arrested for attempted murder, Hamilton stated that he and White
had gone to Jeffries's apartment and that White had shot
Jeffries, although Hamilton's statement claimed that he had been
out in the hallway when the shots were fired. (Tr. 500-03, 525,
532, 537.) Hamilton was on probation following his guilty plea
to possessing a different gun back in 1995. In the fall of 1997,
after he had been held in jail for nine months, he entered into
an agreement with the District Attorney's Office. He agreed to
testify truthfully against White; in exchange, he was released on
bail and reinstated to probation for his 1995 conviction. On
December 17, 1997, he pleaded guilty to a new charge of gun
possession, on the ground that he had been acting in concert with
White on November 4, 1996. (Tr. 485-86, 502-03, 521, 529-31.)

The defense called only one witness, the defendant's sister
Annette White, who testified that the defendant had been at her
apartment at a party on November 4, 1996, from 3:00 p.m. until
after midnight. (Tr. 605-14.) The shooting in Jeffries's
apartment had occurred shortly before 7:30 p.m. (Tr. 380, 429.)

The jury found White not guilty of attempted murder but
guilty of first-degree assault, first-degree burglary, and
second-degree criminal possession of a weapon. On July 30, 1998,
he was sentenced, as a second felony offender, to three
concurrent terms of 15 years in prison.

## The direct appeal

Paul Angioletti, Esq. represented White on appeal. On
February 19, 2001, he submitted a well-written, 44-page brief for
White. (Exh. 1.) It presented five points to the Appellate
Division:

-3-

Point I. The conviction was against the weight of the evidence. (Exh. 1, pp. 16-23.)

Point II. The judge should not have allowed Detective Carley to testify that Hamilton had made a prior consistent statement that White had been the shooter. (Exh. 1, pp. 24-31.)

Point III. The judge's instruction on accomplice testimony was inadequate, even though not objected to. (Exh. 1, pp. 31-37.)

Point IV. The judge's instruction that White's sister was an interested witness was improper, even though not objected to. (Exh. 1, pp. 37-42.)

Point V. The 15-year sentence was excessive. (Exh. 1, pp. 42-44.)

Points I and V did not and do not raise any federal claim. They were addressed to the special discretionary jurisdiction of the Appellate Division. Its unanimous decision said: "The verdict was not against the weight of the evidence. The issues raised by the defendant ... were properly placed before the jury and we find no reason to disturb its credibility determinations. .... Defendant's claim that his sentence is excessive is unpersuasive and we perceive no basis to reduce it." (Exh. 3.)

On Points III and IV, the Appellate Division wrote: "Defendant's contentions concerning the court's charge are ... unpreserved and we decline to review them in the interest of justice." (Exh. 3.) This ruling was entirely reasonable. At Exh. 1, p. 36, n.7, Mr. Angioletti argued that trial counsel should have requested an instruction "as to whether any benefit he [Hamilton] received affected [his] truthfulness." However, at trial counsel's request (Tr. 618) the judge had pointedly commented on Hamilton's plea agreement; see Tr. 672-73, where the reporter's punctuation is muddy but it seems quite clear that the judge told the jury:

> You also [may] wish to consider whether a witness has or does not have an interest in the outcome of the case, which [a]ffects the believability of his or her testimony. A witness is an interested witness when[,] by reason of relationship, friendship, antagonism or prejudice in favor of or against one party or the other[,] [t]he witness's testimony[,] in your judgment[,] is in fact biased or likely biased toward the side or party the witness favors[.]

-4-

> [B]ased on the testimony[,] **you heard about a plea**
> **agreement between the people and Herbie Hamilton.**
> **Mr. Hamilton is an interested witness** in this case.
> Based on the testimony[,] you heard that Annette White
> is the defendant's sister[;] she is an interested
> witness in this case.
>     If you find that a witness is an interested
> witness or if you find that a witness is not an
> interested witness, it is for you to decide whether
> and to what extent, if any, that interest or lack of
> interest affects the believability of the witness.

(Tr. 672-73, with my emphasis.)   White's *pro se* reply memorandum,
at page 38, now argues that the transcript should be corrected to
reflect that the judge said that Mr. Hamilton is a "creditable"
witness and that the defendant's sister is a "creditable"
witness.   I reject this argument.   See earlier, at Tr. 618:

> MR. SPELLMAN:   I would like the direct charge
> that he [Herbie Hamilton] is an interested witness.
> THE COURT:   Based on the cooperation agreement?
> MR. SPELLMAN:   Yes.

Later, during Mr. Spellman's summation, there was an "off the
record discussion at the bench" at Tr. 634, which the judge put
on the record as soon as the jury left the courtroom at Tr. 652:
"I just wanted to get on the record that when I interrupted Mr.
Spellman ... I just wanted to let him know and Miss Roth that
after reviewing the interested witness charge that I was [and am]
going to charge that Mr. Hamilton was an interested witness[;]
and the People, Miss Roth, requested that I charge also the
defendant's sister was an interested witness.   I will do that as
well.   Okay."

        The one other point on appeal was Point II, which invoked
the New York caselaw against "bolstering."   Herbie Hamilton
testified as follows.   On November 4, 1996, he and his uncle
Richard "Moe" White entered the apartment of Leonard Jeffries and
White shot Jeffries twice.   (Tr. 492-98.)   On January 12, 1997,
Hamilton was arrested and questioned by Detective Carley:

> Q.   What did you tell Detective Carley
> happened in that apartment?
> A.   I told him my uncle shot him.

(Tr. 501.)   Mr. Spellman cross-examined Hamilton at Tr. 506-57
and 559-62.   Detective Carley began testifying at Tr. 585.   At
Tr. 589, as soon as the prosecutor started to mention the arrest

-5-

of Hamilton, Mr. Spellman obtained permission to approach the
bench. A robing room conference ensued at Tr. 589-92 (with my
emphasis added):

> MR. SPELLMAN:  Judge, my objection is to the
> hearsay.  ....  **It is clear from Herbie's testimony**
> and it is unchallenged essentially **that he gave this
> detective a statement early on saying** who - - **that
> Richard was involved,** [and] he gave the DA's office
> a statement in October of '97 indicating that Richard
> was involved, and he pled [in December 1997] and said
> the same thing.  Those were not challenged, that those
> statements were made, so why this detective should be
> permitted to testify to hearsay as to what Herbie
> Hamilton told him at some point is particularly
> irrelevant.
>       MS. ROTH:  May I respond?
>       THE COURT:  Yes.
>       MS. ROTH:  ... [O]n cross examination of Mr.
> Hamilton earlier today Mr. Spellman opened the door
> of a recent fabrication[,] that Mr. Hamilton would
> say anything to go forward with a plea bargain made
> with this District Attorney's office[;] and the
> detective[']s statement is being offered to show the
> jury that as far back as January, 1997, well in advance
> of the October 1997 plea bargain worked out with this
> office, he had all along told the authorities who was
> involved and the extent of the involvement, so there
> is no recent fabrication[,] and it should not only be
> Herbie Hamilton's word, which has been impeached by
> cross examination permitted at the trial.
>       THE COURT:  It is not quite ["]all along["]
> but it does pre-date the plea bargain and as such,
> it's a prior consistent statement that is being offered
> here[,] made at a time prior to motive for fabrication,
> so it is not being offered again for the truth but
> again being offered for the fact it was said and it was
> said at a time before the motive to fabricate existed,
> the one that you [Mr. Spellman] have offered[;] and I
> understand you are not challenging it[,] but in a
> situation where you have attacked the credibility of
> the witness in the way that you have, the People are
> allowed to prove that prior consistent statement by
> someone in addition to the declarant, so the objection
> is overruled.

At Tr. 592-94, Detective Carley then testified as follows:

-6-

     Q.  ... I believe I asked you whether or not
Herbie Hamilton made a statement to you when you
arrested him.
     A.  Yes, he did.
         *   *   *
     Q.  Who did he tell you was involved?
     A.  Richard White and Herbie Hamilton.
     Q.  What did he tell you Richard White's role
was in that incident?
     MR. SPELLMAN:  Objection.
     THE COURT:  Overruled.
         *   *   *
     A.  He told me that Richard White had shot
Leonard Jeffries.

On appeal, Mr. Angioletti invoked the New York caselaw
against "bolstering." (Exh. 1, pp. 24-31.) The Appellate
Division ruled:

     Defendant claims that the court erred in
permitting the prosecution to elicit, on rebuttal, the
accomplice's prior consistent statement, in an attempt
to rehabilitate or bolster his testimony implicating
defendant, which had been attacked on cross-examination
as a recent fabrication. The alleged motive for such
recent fabrication was that it was intended to help the
accomplice obtain a favorable plea bargain and to
favorably resolve a possible violation of probation on
an earlier conviction. Defendant contends that the
same motive existed when the accomplice made the prior
statement shortly after his arrest as existed at trial.
However, defendant's objection at trial was made solely
on the ground of relevance and his present objections,
including those relying on the State and Federal
constitutions, have not been preserved for our review
and we decline to review them in the interest of
justice. Were we to do so, we would reject them. One
of the possible reasons for the witness to fabricate,
*viz.*, a possible violation of probation on an earlier
conviction, did not arise until after the earlier post-
arrest statement. "In order to be admissible, the
statement was not required to predate all possible
motives to falsify (*People v. Baker*, 23 N.Y.2d 307,
322-323 [296 N.Y.S.2d 745, 244 N.E.2d 232])" (*People
v. Kanani*, 272 A.D.2d 186, 187, 709 N.Y.S.2d 505, *lv.
denied* 95 N.Y.2d 935, 721 N.Y.S.2d 612, 744 N.E.2d
148).

-7-

"Bolstering claims have been (expressly) held not to be cognizable on federal habeas review." *Diaz v. Greiner*, 110 F.Supp.2d 225, 234 (S.D.N.Y. 2000) (Berman, J., citing cases). *Accord: Nieves v. Fischer*, 2004 WL 2997860, *6-7 (S.D.N.Y. Dec. 28, 2004) (Chin, J.); *Warren v. Conway*, 2008 WL 4960454, *19-22 (E.D.N.Y. Nov. 18, 2008) (Feuerstein, J.). In the case at bar, White's attorney had already cross examined the declarant (Herbie Hamilton) concerning Hamilton's post-arrest statement. Therefore, in my view, White cannot show that he was deprived of his right to confront and cross-examine the declarant even if he could invoke *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004). Any attempt by White to invoke *Crawford* is prohibited by *Whorton v. Bockting*, 549 U.S. 406, 127 S.Ct. 1173 (2007), because White's conviction became final in 2002, long before the *Crawford* decision was issued.

In sum, Mr. Angioletti presented five well-written points of state law on the direct appeal, but none of them has any traction in a federal habeas proceeding, which is limited to issues of federal law.

Starting in 2003, White has made *pro se* attempts to raise issues that were not raised in the direct appeal.

### The first motion to vacate the judgment

In September 2003, White made his first motion to vacate the judgment of conviction. That motion (Exh. 8) made two arguments. First. The motion stated (at p. 1): "Before the arraignment began the defendant was handed an **unsigned** copy of his indictment .... **At no point** before the defendant entered a plea of not guilty **were all the charges read** or did the defendant waive all charges being read ...." (Emphasis added.) The motion argued (at pp. 2-8) that these defects meant that the state court lacked jurisdiction over him and deprived him of due process. Second. The motion (at pp. 9-17) complained about the events at Tr. 597-601. At Tr. 596, the judge told the jury he expected that jury deliberations would begin the next day. At Tr. 598, Juror No. 11 reentered the courtroom in the presence of White, the attorneys, the reporter, and the judge. The juror stated that he was in methadone treatment and normally received a three-day supply; he requested the judge to give him a note so he could get a four-day supply that evening. (The clinic was open 7:00 a.m. to 7:00 p.m.) Mr. Spellman said "That is fine." (Tr. 601.) White made no objection, even though there were alternate jurors (see Tr. 705). Five years later, White noted (Exh. 8, pp. 15-16) that the juror used the word "obtained" to mean "detained" at Tr.

-8-

598 and 599, but this certainly does not show that the juror was unqualified. At page 15, White makes a general assertion that Tr. 598-601 makes clear that the juror "is having a problem comprehending what the court is asking and the court is having a problem understanding his responses." Having read those pages, I emphatically disagree.

Judge Marcus denied the September 2003 motion to vacate, and stated his reasons in an 8-page decision dated December 22, 2003 (Exh. 10). I find the decision to be entirely reasonable. Leave to appeal was denied on April 6, 2004. (Exh. 11.)

### The first application for coram nobis

On April 17, 2004, White made his first application for coram nobis. (Exh. 12.) He told the Appellate Division that he had been denied effective assistance of appellate counsel because Mr. Angioletti's 2001 appeal had failed to make the arguments contained in White's 2003 motion to vacate, and had failed to argue that trial counsel was ineffective for not calling a witness mentioned in the victim's medical records (Mandi Goldstein) and for not making a speedy trial motion.

On July 15, 2004, the Appellate Division denied coram nobis. (Exh. 14.) Leave to appeal to the Court of Appeals was denied on October 22, 2004. (Exh. 15.)

### The habeas petition and the amended habeas petition

As mentioned at page one of today's Report, White sent our Court a habeas petition dated November 21, 2004 and an amended habeas petition dated February 28, 2005.

On July 31, 2005, White made a motion (Exh. 17) asking that his petition be held in abeyance while he made a second motion to vacate in the trial court. By order dated February 2, 2006 (Exh. 18) Judge Karas held the petition in abeyance.

### The second motion to vacate the judgment

Meanwhile, on August 22, 2005, White made the second motion to vacate, arguing that Mr. Spellman had provided ineffective assistance at trial. (Exh. 19.) The District Attorney's office submitted an opposing affirmation and memorandum of law (both at Exh. 20). Justice Marcus denied the motion by issuing a 14-page decision on May 11, 2006. (Exh. 21.) Leave to appeal was denied on August 2, 2006. (Exh. 22.)

-9-

## **The second application for coram nobis**

On August 23, 2006, White made a second application to the Appellate Division for coram nobis. (Exh. 23.) For the first time, White raised an argument based on Tr. 616-17. There, Mr. Spellman asked the judge to give the jury a chance to convict on the lesser included offense of second-degree assault, on the theory that "the jury could find that the result of the bullet wounds was [merely] physical injury as opposed to serious physical injury." (Tr. 616.) The judge explicitly denied Mr. Spellman's application, but the reporter made an obvious mistranscription of one small word, which I shall now emphasize in bold font. The original transcript quoted the judge as ruling: "[B]ased on the evidence in the case, both the testimony of the doctor and the testimony of Mr. Jeffries, there is **a** reasonable view of the evidence that there is [merely] physical injury but not serious physical injuries[,] so that application is denied." (Tr. 617.) Based on the evidence and the context of Mr. Spellman's application, both attorneys clearly understood that the judge had said that "there is **no** reasonable view" that the bullet wounds (which resulted in surgery and 8 days in the hospital) were non-serious. Yet White's second application for coram nobis asserted that Tr. 617 was "tantamount to an acquittal" on the charge of first-degree assault (Exh. 23, p. ii) and therefore when the judge proceeded to submit that charge to the jury he was acting "without legal jurisdiction" and was violating "defendant's rights under the double jeopardy clause" (*Id.*, pp. ii-iii).

In January 2007, the District Attorney's office submitted an opposing affirmation and memorandum of law (both at Exh. 24), along with the court reporter's correction of that one word at Tr. 618 from "a" to "no" (Exh. 25).

On April 12, 2007, the Appellate Division denied coram nobis. (Exh. 26.) I find that ruling entirely reasonable. Leave to appeal to the Court of Appeals was denied on November 15, 2007. (Exh. 27.)

## **The second amended habeas petition**

As noted at pages 1-2 of today's Report, the second amended habeas petition is dated December 14, 2007; ADA Killian's opposing affidavit and memorandum of law was filed on May 9, 2008; and White's reply memorandum was filed on August 11, 2008.

I have already rejected all of White's arguments except for his claim that Mr. Spellman provided ineffective assistance.

-10-

That claim was rejected by the trial judge's decision dated May 11, 2006. (Exh. 21.) I find that decision to be entirely reasonable.

First, White complains that trial counsel should have moved to dismiss the indictment because the People failed to provide him with notice that some charges that were not part of the felony complaint would be presented to the grand jury. The trial judge's decision (Exh. 21, pp. 6-7) cited four First Department cases to show why such a dismissal motion would have been baseless. White's 2008 Reply Memorandum devotes pages 25-27 to this claim, but he simply ignores those four cases.

Second, White complains that trial counsel should have moved to dismiss the indictment based on New York's speedy trial statute. The trial judge's decision (Exh. 21, pp. 7-10) explained why such a motion would have lacked merit. White's 2008 Reply Memorandum devotes pages 28, 29 and 29-A to this claim, but fails to show why the judge's decision was unreasonable.

Finally, White complains that trial counsel "failed to question the complain[an]t witness [Jeffries] regarding his inconsistent stat[e]ment[s] regarding who shot him," and "failed to subpoena" Mandi Goldstein, a social worker whose notes appeared in Jeffries's hospital records. (White's 7/28/08 Reply Memo., p. 30.) This complaint sounds serious, but upon inspection it lacks merit. This complaint appears in White's Reply Memorandum at pages 5 and 30-32, discussing Reply Exhibits B-1, B-2, B-3, and B-4. (Note: The Reply Memorandum at page 30 mistakenly refers to those exhibits as D-1, D-2, D-3, and D-4.) At the end of today's Report, I am annexing copies of those four exhibits but unlike White I am annexing them in chronological order, as follows:

Reply Exh. B-1, Detective Howard Denton's 11/5/96 typewritten memo, says (with my emphasis): "On Nov 4, 1996 at approx 1950 hrs the undersigned with Det Scott responded to ... on a report of a man shot. .... The undersigned did a preliminary interview of the victim who stated that his name was Leonard Jeffries .... Tonight his stepson Herbie Hamilton M-B-19 came to the Apt with his friend M-Black 19 .... [T]he **Male black** then struck him in the head with a gun and then fired 2 shots at him ...." As will be seen, trial counsel managed to avoid opening the door to introduction of this record of Jeffries's 11/4/96 statement. The statement clearly said that the shooter was not Herbie Hamilton but rather "the Male black" who was Herbie's "friend" (even though it erroneously said that this

-11-

friend was also 19).

      Reply Exh. B-3, Jacobi Medical Center Social Worker Mandi Goldstein's 11/6/96 psychosocial assessment, says in part (with my emphasis): "Mr. Jeffries is a 37 year old black male, hospitalized for GSW's to arm and leg. [H]e states that he was arguing with his wife, they spit on each other, and later that nig[ht] **his stepson shot him.** He expressed that th[e] incident was scary and upsetting, and that [he] will not be returning to his wife." As will be seen, the second of the three quoted sentences came into evidence during the cross examination of a Jacobi physician at Tr. 583.

      Reply Exh. B-2, Detective Brusack's 11/10/96 typewritten memo, says (with my emphasis): "Date 11/07/06 .... On this date at approximately 0950 Hrs, .... complainant stated the following: "My wife, Alicea and me had a verbal argument on Sunday, 11/03/96 that turned into a spitting match. Everything was forgotten about, when on Monday night, my wife[']s son, Herbie Hamilton knocked on the door. I opened the door, and **another guy** pushed his way in behind Herbie. .... [T]he **other guy** took out a gun, and hit me in the head with it. .... [T]he **other guy** pointed the gun at me. ...."

      Reply Exh. B-4, Detective Carley's typewritten memo, says (with my emphasis): "Friday 22 NOV 96 at approximately 2010 hrs, while present at the residence of [Leona]rd Jeffries[,] I at this time interviewed the victim regarding the incident. Mr. [Jeffr]ies recounted the facts as given to Det. Brusack on 11/7/06. .... Once the [in]terview was completed the undersigned left the apartment. When leaving Mr. Jef[fries] left also explaining to his wife that he was going out for cigarettes. ... [I]n lobby of building Mr. Jeffries informed me that ... in the course of the struggle and fight the sc[ar]f was moved .... **The second perp. was Moe, a brother of his wife Alecia,** known to [him as?] **Richard White.** At this time Leonard states that initially he was hesitant about [naming?] [he]r brother, partly from fear. He states that he has no doubt that it was [W]hite. He knows him for years."

    Having obtained those four documents from the prosecutor, Mr. Spellman conducted an effective cross-examination of Jeffries at Tr. 449-73, and in particular at Tr. 464-65:

      Q.  And you spoke to a lot of different people, doctors, nurses?
        A.  Yes, I did.
        Q.  Social workers and everything else?

-12-

        A.   Yeah.
        Q.   ... November 6th ... after you were in the
hospital for roughly two days or a day and a half
or whatever, do you remember speaking to a social
worker?
        A.   No, I can't really remember.  I could have,
I can't really say.
        Q.   Okay.  Did you tell a social worker that
you had been arguing with your wife and that you
spit on each other, and later than night your stepson
shot you?
        A.   No, I did not.
        Q.   Are you sure about that?
        A.   I'm positive.  I didn't say nothing like that.
I said that we got into an argument, we spit on each
other and that later on that night, my stepson came
[- -] and shot me?  That is what I said?
        Q.   *Is* that what you said?
        A.   I didn't say anything like that.
        Q.   *Like* that[,] did you say?
        MS. ROTH:  Your Honor, I object.
        A.   First of all I didn't talk to no social worker.

(Tr. 465-65; I have italicized two words for clarity but not
because those two words are important.)  Also, I note that this
passage has been slightly mistranscribed by the District
Attorney's office, first in its February 2006 memorandum (Exh.
20, pp. 6-7) and again in its May 2008 memorandum (pp. 10-11), by
(a) typing a period (rather than a question mark) after the words
"shot me," and (b) omitting the next five words ("That is what I
said?").

        At Tr. 481, the trial was recessed for three days.  On
Monday, June 29, 1998, the prosecution presented three more
witnesses (Hamilton at Tr. 483-563, Jacobi's Dr. Harry Delaney at
Tr. 564-84, Det. Carley at Tr. 584-96) and rested its case at Tr.
596.

        The portion of the victim's testimony quoted above was
contradicted during Mr. Spellman's cross examination of Dr.
Delaney.  At Tr. 581-83, Dr. Delaney testified as follows.  "All
patients are seen by social workers."  The medical record in
front of him on the witness stand contains a report prepared by
social worker Mandi Goldstein, and he has met her.  It is
"frequently" part of the function of a social worker to obtain
information about the way the trauma occurred.  Her record
"states that Mr. Jeffries states that he was arguing with his
wife, that they spit on each other and later that night **his**

-13-

**stepson shot him.**" (Tr. 583, emphasis added.)

When the jury heard this, it was past 2:15 p.m. (when the luncheon recess had ended, Tr. 563-64). Therefore, the prosecution may well have lacked time to bring in Detective Denton to testify that, two days before the social worker's memo, Jeffries had stated that the shooter was not his stepson but rather his stepson's friend. (See Reply Exh. B-1, annexed to today's Report.) The next day, Mr. Spellman presented the defense case. If he had subpoenaed Mandi Goldstein, it seems unlikely that her testimony could have been more helpful to White than what the jury had already heard at Tr. 583. And there would have been a risk that she might have recalled that Jeffries was in pain and/or impatient, and that she might have pointed to her report that Jeffries's "judgment" was merely "fair." Moreover, if Mr. Spellman had subpoenaed Ms. Goldstein, then it seems likely that the prosecution would have had time to bring in Det. Denton as a rebuttal witness. Accordingly, I reject White's assertion that "it was necessary that Mandi Goldstein be called as a defense witness." (7/28/08 Reply Memo., p. 11A.)

The prosecutor's summation, at Tr. 650-51, was forced to deal with Tr. 583 and the victim's 11/6/96 statement to Ms. Goldstein. The guilty verdict shows that the jury was convinced by the testimony of Jeffries and Hamilton that the shooter was Richard White.

In sum, I reject White's assertion that trial counsel "failed to question the complain[an]t witness [Jeffries] regarding his inconsistent stat[e]ment[s] regarding who shot him." (7/28/08 Reply Memo., p. 30.)

In my view, both trial counsel and appellate counsel provided effective assistance to White, and White has not shown that he was deprived of any of his Constitutional rights.

## CONCLUSION AND RECOMMENDATION

For the reasons set forth above, I recommend that Judge Sullivan deny Richard White's second amended habeas petition.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, any party may object to this recommendation within 14 calendar days after being served with a copy **(i.e., no later than January 7, 2010)**, by filing written objections with the Clerk of the U.S. District Court and mailing copies (a) to the opposing party, (b) to the Hon. Richard J. Sullivan, U.S.D.J. at Room 640, 500 Pearl Street, New York, NY

10007 and (c) to me at Room 1360, 500 Pearl Street.  Failure to
file objections within 14 calendar days will preclude appellate
review.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary
of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989) (per
curiam); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), and 6(e).
**Any request for an extension of time must be addressed to Judge
Sullivan.**

DOUGLAS F. EATON
United States Magistrate Judge
500 Pearl Street, Room 1360
New York, New York 10007
Telephone: (212) 805-6175
Fax: (212) 805-6181fax

Dated:    New York, New York
          December 18, 2009

Copies of this Report and Recommendation (and of Exh. B to
White's Reply Memorandum, namely the records of the November 4,
6, 7, and 22 statements by the victim) are being sent by mail to:

Richard White
98-A-5007
Mid-Orange Correctional Facility
90 Kings Highway˙
Warwick, NY 10990
**LEGAL MAIL**

Nancy D. Killian, Esq.
Assistant District Attorney
198 East 161st Street
Bronx, NY 10451

Hon. Richard J. Sullivan
U.S. District Judge
500 Pearl Street, Room 640
New York, NY 10007

-15-